IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| BOBBY SPIRES, ) | Civil Action No. 3:07-3194-HMH-JRM |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **REPORT AND RECOMMENDATION** |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| COMMISSIONER OF SOCIAL SECURITY, ) | |
| ) | |
| Defendant. ) | |
| ) | |

This case is before the Court pursuant to Local Rule 83.VII.02, et seq., D.S.C., concerning the disposition of Social Security cases in this District. Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) to obtain judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his claims for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB").

**ADMINISTRATIVE PROCEEDINGS**

On June 4, 2004, Plaintiff applied for SSI, and he applied for DIB on June 28, 2004. Plaintiff's applications were denied initially and on reconsideration, and he requested a hearing before an administrative law judge ("ALJ"). After a hearing held November 14, 2006, at which Plaintiff appeared and testified, the ALJ issued a decision dated March 30, 2007, denying benefits and finding that Plaintiff was not disabled because under the vocational guidelines promulgated by the Commissioner, Plaintiff remains able to perform work found in the national economy. See generally 20 C.F.R., Part 404, Subpart P, Appendix 2.

Plaintiff was thirty-four years old at his alleged onset date and thirty-eight years old on the date of the ALJ's decision. He has a high school education and past relevant work as a truck driver,

beer vendor/truck driver, grocery store stocker, mobile home repossessor, forklift driver, and warehouse supervisor. Plaintiff alleges disability since April 7, 2003, due to neck injuries, migraine headaches, back fractures, and a right leg fracture.

The ALJ found (Tr. 16-22 ):

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2008.

2. The claimant has not engaged in substantial gainful activity at any time relevant to this decision (20 CFR 404.1520(b) and 416.920(b)).

3. The claimant has the following severe impairment: degenerative disc disease (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of light work. The claimant does not have any non-exertional limitations that would prevent him from performing a full range of light work.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on November 12, 1968, and was 34 years old on the alleged disability onset date, which is defined as a younger individual age 18-44 (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. The claimant's previously acquired job skills are not transferable to jobs within his residual functional capacity (20 CFR 404.1568 and 416.968).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant

>    number in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c) and 416.966)[)].
>
> 11. The claimant has not been under a "disability," as defined in the Social Security Act, from April 7, 2003, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

On September 10, 2007, the Appeals Council denied Plaintiff's request for review, making the decision of the ALJ the final action of the Commissioner. Plaintiff filed this action on September 21, 2007.

The only issues before this Court are whether correct legal principles were applied and whether the Commissioner's findings of fact are supported by substantial evidence. Richardson v. Perales, 402 U.S. 389 (1971) and Blalock v. Richardson, 483 F.2d 773 (4th Cir. 1972). Under 42 U.S.C. §§ 423(d)(1)(A) and 423(d)(5) pursuant to the Regulations formulated by the Commissioner, Plaintiff has the burden of proving disability, which is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months...." See 20 C.F.R. § 404.1505(a) and Blalock v. Richardson, supra.

## **MEDICAL HISTORY**

Plaintiff sustained compression fractures of his lumbar spine and fractured his femur (which required surgical rod placement) in an automobile accident in 1997. See Tr. 114, 125, 128, 140, 164-167, 181, 191. On May 2004, Plaintiff was examined at the Michael Watson Rural Health Clinic. Plaintiff complained of back pain, arm/leg numbness, and muscle spasms. Plaintiff was diagnosed with back pain and muscle weakness and prescribed Flexeril and Vicoprofen. Tr. 114. A cervical spine x-ray on May 18, 2004 was unremarkable. A thoracic spine x-ray revealed upper

thoracic levo-scoliosis. A lumbar spine x-ray showed L1 and L4 vertebral body compression fractures of indeterminate age and etiology as well as degenerative changes of the lumbosacral junction. Tr. 144-146.

Dr. Randall Drye, a neurosurgeon, began treating Plaintiff on June 25, 2004. Plaintiff complained of paresthesias of his neck and right upper extremity; low back pain; right leg symptoms; worsening back pain; and pain in his neck, shoulder, arm, and knee. Dr. Drye noted that Plaintiff had normal range of motion in his cervical spine, although extension and flexion were somewhat painful. He found that Plaintiff had tenderness in his posterior musculature, particularly on the right; normal right shoulder range of motion without pain, tenderness, or crepitus; no flexion at the waist because of pain; negative bilateral straight leg raising tests; full hip ranges of motion; and obvious spasm and tenderness of the lumbar paraspinous muscles. Dr. Drye also found that Plaintiff had 5/5 strength bilaterally in all muscle groups of the upper and lower extremities; normal reflexes; and intact cerebellar function with normal station, gait, and coordination. He diagnosed stable compression fractures and prescribed Naprosyn, Flexeril, and Tylox. Dr. Drye recommended cervical and lumbar MRI studies and stated that he did not think it was in Plaintiff's best interest to return to work at that time. Tr. 128-129, 133.

Plaintiff underwent a lumbar spine MRI on June 29, 2004, which revealed two compression fractures at L1 and L4, which "appeared to be old" based on signal characteristics. The MRI showed that the posterior portion of the vertebral body at L4 was retropulsed, leading to significant compromise of the central canal and lateral recesses. There was an indication that this might be leading to bilateral L4 and/or L5 radiculopathy. The MRI further revealed a small L5-S1 focal disc protrusion which did not lead to canal or foraminal stenosis. Tr. 131-132, 162-163. A cervical spine

MRI performed that same day showed questionable narrowing in the right C4-5 foramen, but no other abnormalities, degenerative changes, or stenosis. Tr. 134.

On July 2, 2004, Plaintiff complained of continued pain in his right neck, scapula, and shoulder; low back pain; and weakness/numbness in his legs with standing/walking. Dr. Drye noted that Plaintiff's physical examination was unchanged and thought that Plaintiff was perhaps symptomatic from foraminal stenosis on the right at C4-5. A Medrol Dosepak was prescribed. Tr. 126. On July 22, 2004, Plaintiff received an epidural steroid injection at L5-S1. Tr. 125. On August 10, 2004, Plaintiff reported right arm, right shoulder, back, and bilateral leg pain. He complained that he could not stand or walk for any length of time and requested surgery. Dr. Drye took Plaintiff's request for surgery under advisement and prescribed Robaxin and Vicodin. Tr. 124. On August 14, 2004, Dr. Drye recommended that Plaintiff undergo a bilateral L3-4 and L4-5 discectomy and partial corpectomy for decompressive purposes. Tr. 123.

On August 17, 2004, Dr. James Weston, a State agency physician, reviewed the medical evidence. He opined that Plaintiff could perform light work that did not require more than occasional climbing, stooping, kneeling, crouching, and crawling, and that did not require more than frequent balancing. Tr. 149-156.[1]

On August 18, 2004, Plaintiff underwent bilateral L3-4 and L4-5 decompression surgery with laminotomies of L3 and L5, with a full bilateral laminectomy of L4 for decompression with partial L4 vertebral body corpectomy. Tr. 115-116. Plaintiff complained of a great deal of pain and spasm on August 30, 2004. Dr. Drye noted that Plaintiff had "obvious spasm in the surgical region of the

---

[1] On April 15, 2005, Dr. Richard Weymouth, a State agency physician, reviewed the medical evidence and affirmed Dr. Weston's August 2004 findings. Tr. 156.

back as well as episodes of spasm in the right leg." He noted that Plaintiff walked with a cane for support. Plaintiff reported that he felt "less pressure" and his left side was "doing exceedingly well." He complained of difficulty standing or walking for any length of time, a need to change positions when sitting, and difficulty sleeping. Dr. Drye noted that Plaintiff had tightness of his musculature with some spasm bilaterally. Physical examination revealed that Plaintiff could stand and bend with discomfort; had a tight hamstring on the right; and normal motor strength, sensation, and reflexes. Dr. Drye stated that, given the magnitude of his surgery, Plaintiff was doing "relatively well." He encouraged Plaintiff to walk and ambulate more at home and prescribed Vicodin, Robaxin, and Ambien. Tr. 120.

Dr. Drye examined Plaintiff again on September 22, 2004. Plaintiff reported that his spasms were somewhat improved and he had limited mobility, leg weakness, difficulty walking to the mailbox and back, and irritability. Dr. Drye noted that Plaintiff could stand and bend with some discomfort and had tight hamstrings, no radicular pain with straight leg raising tests, and normal motor and sensory examinations. Dr. Drye recommended physical therapy and prescribed Robaxin and Vicodin. Tr. 119.

Plaintiff was examined by Dr. Drye again on September 28, 2004, after Plaintiff reported that he fell on some steps at home two days previously (Plaintiff had declined Dr. Drye's earlier advice to go to the emergency room and have x-rays taken). Plaintiff reported intractable spasms and markedly increased back pain. Physical examination revealed that Plaintiff had spasmodic musculature, good strength in his distal extremities, and intact sensation. Dr. Drye noted that the lightest touch of Plaintiff's back resulted in Plaintiff grimacing and reporting severe pain. He

6

prescribed Valium and Mepergan. Tr. 118. A lumbar spine x-ray showed normal alignment and L1 and L4 compression fractures of indeterminate age. Tr. 130.

On October 22, 2004, physical therapist John Ludkowski evaluated Plaintiff. Plaintiff reported that he had constant pain; difficulty standing, sitting, and walking for prolonged periods; and limited flexion, extension, and left side-bending. Mr. Lukowski noted that Plaintiff had positive straight leg raising tests and 2+/5 strength in his lumbar spine extensor and abdominal muscles. It was recommended that Plaintiff begin a course of home exercises, electric stimulation, moist heat, and biweekly therapy. Plaintiff attended three physical therapy sessions, but missed five other sessions between October 25 and December 6, 2004. Tr. 137-141, 172-176.

Dr. Drye examined Plaintiff again on November 19, 2004. He noted that Plaintiff was looking better than he had seen him at any point in the past, was doing well in physical therapy, and wearing a brace with significant relief. Plaintiff reported that he ran out of medications, but was trying to manage without them; he had "much less discomfort and improving mobility; and was standing, walking, and doing considerably more with less pain. Physical examination revealed that Plaintiff had limited flexion and extension at his waist, but stood and talked to his physician for an extended period without great discomfort. Dr. Drye recommended continued physical therapy and prescribed Percocet and Valium. Tr. 121, 161.

On January 26, 2005, Plaintiff reported that he was doing quite well, had completed physical therapy or stopped attending because of finances, continued to do many of the exercises at home, needed less pain medication, was weaning himself off the brace. Plaintiff also complained of occasional back spasms; increased pain in his neck, shoulder, and arm; numbness and tingling in his arm; and headaches. Dr. Drye noted that Plaintiff had limited flexion and extension at the waist; was

7

able to move about in a much more comfortable manner; and could sit, stand, and talk with little problem. Plaintiff had negative straight leg raising tests and no active spasm. He had neck tension, normal sensation, symmetric reflexes, and mild right triceps weakness. Dr. Drye diagnosed Plaintiff with an exacerbation of cervical stenosis and possible radiculopathy. He prescribed a Medrol Dosepak, Robaxin, and Percocet and recommend that Plaintiff continue his back exercises and activities at home. Tr. 117.

On February 10, 2005, Plaintiff underwent an epidural steroid injection and reported no change in his pain from it. Tr. 170. On March 21, 2005, physical therapist Edith Simmons noted that Plaintiff was independent in his activities of daily living and demonstrated proper understanding and technique of his home exercise program. She did not foresee any barriers to Plaintiff returning to normal activities and discharged him from physical therapy. Tr. 135, 171.

On April 6, 2005, Plaintiff complained "bitterly" of neck pain to Dr. Drye. He stated that he experienced an audible pop in his neck the previous day and experienced increased neck pain, spasm, and arm and shoulder pain. Plaintiff reported hand and arm paresthesias and discomfort and swelling in his back with standing for any length of time. Dr. Drye noted that Plaintiff's physical examination was essentially unchanged. He recommended that Plaintiff undergo a cervical spine MRI and prescribed Robaxin. Tr. 160.

On April 22, 2005, a cervical spine MRI revealed that Plaintiff had mild spondylosis with some low-grade narrowing of the right nerve root foramina at C5-6 and C4-5. Tr. 159. On April 25, 2005, Plaintiff continued to have "bitter complaints of neck pain and spasm" and occipital headaches. Tr. 158. Dr. Drye noted that Plaintiff had great tension in his neck musculature with very limited

flexion, extension, or rotation of the neck. He opined that Plaintiff appeared to have myofascial spasm, but no clear cut spinal pathology in need of surgery. Dr. Drye prescribed Valium and Tylox and recommended more physical therapy. Plaintiff underwent epidural steroid injections on June 14 and 30, 2005. He reported a decrease in pain after the second injection. Tr. 167-169.

On September 26, 2005, Dr. Drye noted that Plaintiff underwent EMG/nerve conduction studies of his upper and lower extremities which were unrevealing and did not suggest evidence of myelopathy or radiculopathy. Plaintiff complained that he was treated very poorly and essentially accused of malingering. Dr. Drye noted that Plaintiff had mild carpal tunnel syndrome on the left. He wrote that Plaintiff appeared to be functioning fairly well as to his back problem, was walking independently, and performing relatively normal activities. Dr. Drye stated that Plaintiff appeared to have recovered from his lumbar surgery and did not have a compressive lesion in his cervical spine that would respond to surgery. He opined that Plaintiff might benefit from physical therapy, injections, and pain management, but did not see any reason for active neurosurgical follow-up. Tr. 157.

Plaintiff was evaluated by Dr. W. Daniel Westerkam on October 20, 2005. Dr. Westerkam noted that Plaintiff had intact sensation, 4/5 muscle strength throughout, and multiple tender areas along his rhomboids, levator scapulae, and trapezius. Plaintiff was diagnosed with persistent chronic pain involving his neck and back and myofascial pain with trigger points in the scapular region. Dr. Westerkam recommended aggressive physical therapy, but Plaintiff reported he was not interested in such a program. He recommended that a physical therapist review a series of exercises that Plaintiff could do at home and recommended that Plaintiff walk on a daily basis to improve his

9

aerobic conditioning. Dr. Westerkam did not believe that narcotics were needed at the time and prescribed Elavil. Tr. 165-166.

On November 17, 2005, Plaintiff reported that he was actively exercising and felt better, but still had pain and limitations on how long he could stand or walk. Dr. Westerkam noted that Plaintiff had intact sensation, normal reflexes, 4/5 muscle strength throughout, and negative straight leg raising tests. He stated that Plaintiff's neck appeared to be improved, but his back pain persisted. Dr. Westerkam recommended continued home exercises; prescribed Ultram, Flexeril, and Ambien; and recommended that Plaintiff start walking on a daily basis and gradually increase his time up to 30 minutes. Tr. 164.

On May 26, 2006, Plaintiff was treated in the Lexington Medical Center emergency room for complaints of severe back pain from an injury related to a falling lawn mower. He complained of bowel incontinence and weakness in his legs and an inability to walk across a room without severe pain. Dr. Lee Boguski noted that Plaintiff had low back tenderness to palpation, with good ranges of motion and intact sensation in his lower extremities. Lumbar spine x-rays (Tr. 187) revealed chronic anterior compression of L1 and L4 with no significant changes since the previous study, although there was increased anterior osteophyte formation from L2 to L4. Dr. Boguski diagnosed Plaintiff with severe back pain, progressive incontinence, L4 bony fragment retropulsion, and an S1 nerve root compression. Tr. 181-182.

A lumbar spine MRI on May 26, 2006, showed remote L1 and L4 level compression fractures; presumed chronic bony retropulsion at the L4 level which generated moderate to severe central spinal stenosis with a reduction of the anterior-posterior canal diameter to no more than five millimeters. The MRI also revealed a broad-based disc bulge and a superimposed right paracentral

protrusion at the lumbosacral junction with inferior migration of the protruded disc material. It indicated that, while there was a component of mild central spinal narrowing, mass effect was predominantly on the right S1 nerve root in the lateral recess. Surgical evaluation was recommended to assess the need for further decompressive laminectomy at the L4 level and to assess the clinical significance of the right paracentral protrusion at the lumbosacral level. Tr. 186.

Dr. Brett Gunter, who also examined Plaintiff in the emergency room, noted that Plaintiff had limited motion in his right lower extremity due to pain, but moved all four extremities well; had 5/5 upper extremity strength, 4+ to 5/5 lower extremity strength, increased back/right leg pain with examination of proximal muscles; intact sensation; 0/4 Achilles and bilateral tendon reflexes; and 1/4 biceps and brachioradialis reflexes. He wrote that Plaintiff had a slow gait, but limped favoring his right leg. Dr. Gunter diagnosed Plaintiff with intractable low back pain with bilateral leg radiation, right greater than left, with MRI finding of right L5-S1 herniated nucleus pulposus. Plaintiff was admitted to the hospital for pain control. Tr. 183-185.

Plaintiff was examined by Dr. Andrew Freese of the University of South Carolina Division of Neurosurgery on November 17, 2006. Plaintiff reported that he continued to have intractable back and leg pain that worsened with ambulation and right leg numbness, and tingling. Dr. Freese noted that Plaintiff was in severe discomfort and had decreased lower extremity reflexes and variable light touch sensation in his lower extremities. Dr. Freese noted that Plaintiff's motor examination was markedly affected by his perception of pain, but he was able to ambulate with the right leg. Dr. Freese discussed further surgery with Plaintiff. He noted that Plaintiff's pain syndrome appeared to be real, but Plaintiff seemed to have an exaggerated response to it. Tr. 191-192.

On December 1, 2006, Dr. Freese noted that a lumbar CT scan showed evidence of the previous laminectomies, persistent stenosis, and some collapse at L4 anteriorly. He also noted that the CT showed slight kyphosis, although it was not severe, and abnormal facet joints. Dr. Freese recommended trying facet block injections prior to deciding if surgery was necessary. Tr. 190.

## **DISCUSSION**

Plaintiff alleges that: (1) the ALJ failed to properly assess the opinion of his treating physician; (2) the ALJ did not sufficiently explain the findings regarding Plaintiff's residual functional capacity ("RFC") as required by Social Security Ruling 96-8p; and (3) the ALJ failed to correctly assess Plaintiff's credibility and subjective allegations of disabling pain.[2] The Commissioner contends that the ALJ's decision is supported by substantial evidence[3] and free of legal error.

---

[2] In assessing credibility and complaints of pain, the ALJ must: (1) determine whether there is objective evidence of an impairment which could reasonably be expected to produce the pain alleged by a plaintiff and, if such evidence exists, (2) consider a plaintiff's subjective complaints of pain, along with all of the evidence in the record. See Craig v. Chater, 76 F.3d 585, 591-92 (4th Cir. 1996); Mickles v. Shalala, 29 F.3d 918 (4th Cir. 1994). Although a claimant's allegations about pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which the impairment can reasonably be expected to cause the pain the claimant alleges he suffers. A claimant's symptoms, including pain, are considered to diminish his or her capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical and other evidence. 20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4).

[3] Substantial evidence is:
> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984); Laws v. Celebreeze, 368 F.2d 640, 642 (4th Cir. 1966). It must do more, however, than merely create a suspicion that the fact to be established exists. Cornett v. Califano, 590 F.2d 91, 93 (4th Cir. 1978).

Plaintiff alleges that the ALJ failed to properly assess the August 2006 opinion of his treating neurosurgeon, Dr. Drye. In a letter dated August 23, 2006, Dr. Drye wrote that Plaintiff had been a patient in his neurological practice and Plaintiff had complaints of chronic back pain and leg symptoms with a preexisting L4 compression fracture creating severe stenosis. Dr. Drye noted that imaging studies revealed spondylosis with degenerative changes with arthritis. He opined:

> [Plaintiff] can likely stand or sit for 30-45 minute periods and then needs to change position for comfort. He should not stoop in a repetitive manner[,] but only occasionally. Because of the condition of both his neck and lumbar spine, I believe that he should not lift or carry greater than ten pounds and certainly not even this on a repetitive basis. The patient's MRI finding of degenerative narrowing and arthritic change in the cervical spine certainly is collaborative of much of his pain complaints. [Plaintiff's] low back has undergone a very extensive fracture and decompressive repair and his pain is unlikely to resolve without continued pain management. While I practice medicine and [I am] not able to definitely determine someone's abilities or disabilities, I do think that the above restriction should be considered permanent, that his condition has only fair prognosis in terms of pain control and that these situations are permanent. Whether or not his is employable would certainly be a matter to be decided by the appropriate authorities[,] not a treating physician.

Tr. 188.

Plaintiff alleges that the ALJ failed to properly consider Dr. Drye's opinion because the ALJ did not consider all of the evidence. He also argues that the ALJ references statements about Plaintiff doing fairly well and relatively good, but ignores references to his more debilitating pain and limitations. Plaintiff alleges that the ALJ incorrectly attributed statements to Dr. Drye which were made by Dr. Freese. Additionally, Plaintiff argues that there is a lack of any contradictory statements as to Dr. Drye's opinions other than that of the non-examining, non-treating state agency, which the ALJ did not discuss. The Commissioner contends that the ALJ properly considered Dr. Drye's opinion and found that it was not entitled to controlling weight. Specifically, the Commissioner argues that the ALJ's decision is well supported because Dr. Drye had not examined Plaintiff for

13

almost a year when he rendered his opinion, his opinions were inconsistent with his own treatment notes, and Dr. Drye's opinion was inconsistent with other evidence of the record including physical therapist Ms. Simmons' notes about Plaintiff's abilities and the findings of Dr. Westerkam in October and November 2005. The Commissioner contends that the ALJ's attribution of Dr. Freese's statements as those of Dr. Drye is harmless error as Dr Freese's statements were inconsistent with Dr. Drye's opinion that Plaintiff could only sit for 30-45 minutes at a time and lift no more than ten pounds.

Although it is not binding on the Commissioner, a treating physician's opinion is entitled to great weight and may be disregarded only if persuasive contradictory evidence exists to rebut it. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996); Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1988), and Foster v. Heckler, 780 F.2d 1125, 1130 (4th Cir. 1986). In those cases, the court emphasized the importance of giving great weight to the findings of the plaintiff's treating physician. See also Mitchell v. Schweiker, 699 F.2d 185 (4th Cir. 1983). The court in Mitchell also explained that a treating physician's opinion should be accorded great weight because "it reflects an expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." An ALJ, therefore, must explain his reasons for disregarding a positive opinion of a treating physician that a claimant is disabled. DeLoatche v. Heckler, 715 F.2d 148 (4th Cir. 1983).

The Commissioner is authorized to give controlling weight to the treating source's opinion if it is not inconsistent with substantial evidence in the case record and it is well supported by clinical and laboratory diagnostic techniques. 20 C.F.R. § 404.1527(d)(2). The Court in Craig found by negative implication that if the physician's opinion "is not supported by clinical evidence or if it is

14

inconsistent with other substantial evidence, it should be accorded significantly less weight." Craig, 76 F.3d at 589.

The ALJ's decision to not give controlling weight to Dr. Drye's August 23, 2006 opinion is not supported by substantial evidence. In particular, the ALJ does not appear to have considered the results of Plaintiff's 2006 lumbar MRI, taken after Plaintiff was involved in an incident with a falling lawnmower. The Commissioner concedes that the ALJ did not summarize the findings from the MRI, but argues that the ALJ cited to "exhibit 9F" which included the MRI study. The Commissioner, citing Craig v. Apfel, 212 F.3d 433, 436 (8th Cir. 2000), argues that an "ALJ is not required to discuss all the evidence submitted" and "an ALJ's failure to cite specific evidence does not indicate that it was not considered." Id. at 436. Here, however, it is unclear from the ALJ's opinion whether he considered the 2006 lumbar MRI because he cites to evidence of the lumbar x-ray instead of the MRI . In Craig v. Apfel, the plaintiff argued that the ALJ improperly assessed her RFC by failing to give insufficient weight to certain parts of the opinion of her treating physician concerning her ability to reach, push, or pull. The Eighth Circuit noted that the record contained the opinion of two consulting physicians, neither of whom made any observations that would support Craig's allegations of complete disability; Plaintiff made no mention in her testimony of any difficulties reaching, pushing, and pulling; and she testified that she continued to engage in many normal daily activities of living. The Court found that "given the ALJ's explicit reliance on some of [Craig's treating physician's] conclusions, we find it 'highly unlikely that the ALJ did not consider and reject' those portions of his report that Craig now points to in support of her appeal." Id. at 436 (citing Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998). Here, the ALJ appears to have discounted the treating physician's opinion in large part because it was not supported by the objective medical

evidence, but it is unclear whether the ALJ considered the May 2006 lumbar MRI which appears to support Dr. Drye's opinion.

Although the 2006 lumbar x-ray shows a few of the same findings as the MRI, the MRI showed presumed chronic bony retropulsion at the L4 level, generating moderate to severe central spinal stenosis with a reduction of the anterior-posterior canal diameter. It also showed a broad-based disc bulge and a superimposed right paracentral protrusion at the lumbosacral junction with inferior migration of the protruded disc material. The report provides that while there was a component of mild central spinal narrowing, the mass effect was predominantly on the right S1 nerve root in the lateral recess. Tr. 186. Although there is no record of Dr. Drye examining Plaintiff after September 2005, he appears to have based his opinion in large part on the 2006 lumbar MRI which may show a worsening of Plaintiff's conditions after the May 2006 lawnmower incident.

Additionally, the ALJ mistakenly attributed the findings of Dr. Freese in November and December 2006 to Dr. Drye. The ALJ also does not appear to have fully considered Dr. Freese's notes indicating that Plaintiff might be a candidate for surgery if the facet block injections were not successful. See Tr. 190.

## **CONCLUSION**

The Commissioner's decision is not supported by substantial evidence. This action should be remanded to the Commissioner to properly consider Dr. Drye's August 2006 assessment in light of all of the evidence, including Plaintiff's 2006 lumbar MRI. Upon remand, the Commissioner

should also be directed to consider Plaintiff's RFC and credibility in light of all of the evidence[4] and continue the sequential evaluation process if necessary.

RECOMMENDED that the Commissioner's decision be **reversed** pursuant to sentence four of 42 U.S.C. §§ 405(g) and 1383(c)(3) and that the case be **remanded** to the Commissioner for further administrative action as set out above.

Respectfully submitted,

Joseph R. McCrorey
United States Magistrate Judge

January 15, 2009
Columbia, South Carolina

---

[4] As it is unclear whether the ALJ considered all of the evidence in making his decision, it is unclear whether he properly evaluated Plaintiff's RFC and credibility.